**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

SANDRA G. CAHILL, as Personal Representative of the Estate of DAVID W. CAHILL, M.D.

Plaintiff,

vs.

THE UNITED STATES OF AMERICA,

Defendant.
______________________________/

Lead Case No.: 8:05-CV-2379-T-24MSS

**MEMBER CONSOLIDATED CASES**
Brown v. USA: 8:05-CV-02380-SCB-MSS
Lomel v. USA: 8:05-CV-02381-SCB-MAP
Murphy v. USA: 8:05-CV-02382-SCB-EAJ

**O R D E R**

This matter came before the Court on a non-jury trial that was held February 19 - 28, 2008.[1] This Court has jurisdiction over this action pursuant to 28 U.S.C.§ 1346(b) and 28 U.S.C. §§ 2671 *et seq*. After considering all the evidence, the pleadings filed by the parties, the arguments made by counsel, and the legal authorities submitted to the Court, the Court makes the following findings of fact and conclusions of law. To the extent that any of the findings of fact might constitute conclusions of law, they are adopted as such. Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

## I. Background

This case was originally filed as four separate actions. The survivors and the estates of the deceased on behalf of the surviving families each sued the United States under the Federal Torts Claims Act, 28 U.S.C. § 1346(b) and 28 U.S.C. §§ 2671 *et seq*. On April 20, 2006, this

[1] This Court granted the parties' motion to bifurcate this action into two separate trials. (Doc. No. 47.) The trial that is the subject of this order was only on the issue of liability.

Court consolidated the four separate cases into this one action. (Doc. No. 16.)

The airplane accident that forms the basis of this case occurred on July 2, 2003, at the Memphis International Airport in Memphis, Tennessee. Dr. David Cahill was pilot-in-command and a co-owner of the aircraft involved in the accident, a Beech 58P Baron (the "Baron"), Federal Aviation Administration ("FAA") registration number N36TL. Just before landing, the Baron rolled, inverted, and crashed. Dr. David Cahill and the front seat passenger, John Murphy, were killed in the crash; the two rear-seat passengers, Charles Lomel and Edward Brown, sustained serious injuries.

Plaintiffs Sandra G. Cahill, as personal representative of the estate of Dr. David Cahill, Edward Brown, Charles Phillip Lomel, Jr. and Margaret Lowelle Meyer Lomel, and Amber Rene Murphy, as personal representative of the estate of John M. Murphy (jointly, "Plaintiffs") allege that the air traffic controllers at the Memphis International Airport negligently failed to provide the required minimum separation distance between the Baron and a larger aircraft landing ahead of it, an Embraer Regional Jet 145 (the "Embraer"). Plaintiffs allege that this failure unnecessarily exposed the Baron to the wake turbulence created by the Embraer. Plaintiffs further allege that because of the Memphis air traffic controllers' negligence, the Baron encountered the wake vortex of the Embraer, causing the Baron to abruptly roll left and crash on its roof, killing Dr. David Cahill and John Murphy, and seriously injuring Charles Lomel and Edward Brown.

The government denies any negligence on the part of the air traffic controllers at the Memphis International Airport, alleges that it was not possible for the Baron to encounter the wake vortex of the Embraer, and that wake turbulence did not cause the accident. The government further alleges that the cause of the accident was pilot error.

## II. Findings of Fact

On July 2, 2003, at 10:05 a.m. Central Daylight Time, the Baron collided with the ground while attempting to land on runway 36 Right at the Memphis International Airport, in Memphis, Tennessee. Two full minutes, or 120 seconds, before the Baron rolled over and crashed, the Embraer landed on runway 36 Center. Runway 36 Center and 36 Right are parallel runways 900 feet apart.

The Baron was a six seat, twin-engine aircraft with a pressurized cabin. It was manufactured in 1981 and powered by two turbo-charged engines. The Baron was properly maintained by Dr. Cahill and Dr. Daniel Greenwald, who co-owned the Baron with Dr. Cahill. There was no evidence that the Baron was not airworthy on the day of the accident. There was also no evidence of a mechanical problem or a mechanical failure which caused or contributed to the accident.

The flight departed Peter O. Knight Airport, Tampa, Florida, about 7:58 a.m. Eastern Daylight Time[2] on July 2, 2003. Dr. Cahill, a neurosurgeon, and his three passengers, employees of Medtronics, Inc., a medical technology company, were planning to attend a business meeting in Memphis, where Medtronics has its headquarters. Dr. Cahill offered to use the Baron, his private aircraft, for the trip. Dr. Cahill held a private pilot certificate issued August 16, 1969, with ratings for single engine, multi-engine, and instrument airplanes. His pilot certificates were current, and his pilot log books show that he had approximately 3,211 total flight hours, which included 3,005 as pilot-in-command and 923 hours in multi-engine airplanes. Dr. Cahill had logged 95 hours in the Baron since July 28, 2002. Dr. Cahill was a competent and experienced

[2]All references to time contained hereafter within this Order are in Eastern Daylight Time.

pilot, with significant experience flying the Baron.

*Wake Turbulence Standards*

Wake turbulence is created by the forces that lift the aircraft. High pressure air from the lower surface of the wings flows around the wingtips to the lower pressure region above the wings. A pair of counter-rotating wake vortices are thus shed from the wings. One characteristic of wake turbulence, or wake vortices, is that they sink or descend. Aircraft weight is a significant contributing factor to the strength of wake turbulence – that is, heavier aircraft create stronger wake turbulence.

The wake turbulence created by larger aircraft can pose a hazard to smaller aircraft which may encounter the wake turbulence of a larger aircraft. To avoid such hazards, the FAA created separation standards, which are found in FAA Order 7110.65N. Section 5-5-4(f) of FAA Order 7110.65N instructs air traffic controllers to separate an aircraft landing behind another aircraft on the same runway by certain minimum distances, measured in nautical miles. Because of the possible effects of wake turbulence, Section 5-5-4(f) notes that air traffic controllers should consider parallel runways less than 2,500 feet apart as a single runway. Runway 36 Center and 36 Right at the Memphis International Airport are parallel runways 900 feet apart. There are three weight categories, for wake turbulence purposes: small, large and heavy. Section 5-5-4(f) mandates that the following minima will exist at the time the preceding aircraft is over the landing threshold: "1. Small behind large – *4 miles*. 2. Small behind B757 – *5 miles.* 3. Small behind heavy – *6 miles*." These separation standards are set considering the largest aircraft in a given weight category.

The Baron was classified as a "small" aircraft, and the Embraer as a "large" aircraft, although the Embraer was one of the lightest and smallest aircraft in the "large" category. Thus,

Section 5-4-4(f) of FAA Order 7110.65N required the Memphis air traffic controllers to separate the Baron from the Embraer by four nautical miles, measured at the time the Embraer was over the landing threshold.

*Radio Communications*

At 09:54:55 a.m., Dr. Cahill contacted the Memphis Air Traffic Control Tower Arrival Final East Position ("ARM"), and reported that the flight was at 4,000 feet mean sea level ("MSL"). The ARM responded that Dr. Cahill could expect an ILS[3] approach on runway 36 Right, and Dr. Cahill acknowledged. ARM subsequently cleared the Baron to descend and maintain 3,000 feet MSL. At 09:58:11 a.m., ARM instructed Dr. Cahill to reduce the Baron's speed to 170 knots, and Dr. Cahill acknowledged. At 09:58:43 a.m., ARM told Dr. Cahill that he would be landing four nautical miles behind the Embraer, cautioned him about possible wake turbulence, and Dr. Cahill acknowledged. At 09:59:46 a.m., ARM told Dr. Cahill to reduce his speed to 160 knots, and Dr. Cahill acknowledged. At 10:00:13 a.m., ARM told Dr. Cahill to maintain 3,000 feet MSL and speed of 160 knots until the Baron reached the Final Approach Fix, and Dr. Cahill acknowledged. At 10:00:47 a.m., ARM again cautioned Dr. Cahill of the possible wake turbulence and instructed him to contact the Memphis Air Traffic Control Tower on the local control frequency, and Dr. Cahill acknowledged. At 10:00:55 a.m., Dr. Cahill contacted the Memphis Air Traffic Control Tower Local Control Two Position ("LC2"), and reported that the flight was inbound for landing on runway 36 Right. At 10:00:59 a.m., LC2 cleared the Baron to land on runway 36 Right, and Dr. Cahill acknowledged. No further radio communication was

---

[3]An ILS or "Instrument Landing System" approach uses an electronic system that provides horizontal and vertical guidance to a specified runway. Aircraft landing on runway 36 Right, one of three parallel runways at Memphis, touch down facing North on a compass heading of approximately 360 degrees.

received from the flight.

*Accident Reconstruction*

The government offered Dr. Kenneth Orloff as an expert in the area of accident reconstruction. Dr. Orloff has a masters degree in physics, a PhD in mechanical engineering with an emphasis on aeronautical engineering, worked as a NASA research scientist for 13 years where he did a significant amount of research on the structure and details of wake turbulence, and developed a credible and accurate computer program used in performing flight path analyses using radar data. It was Dr. Orloff's opinion that Plaintiffs' allegation that this accident was the result of a wake turbulence encounter was contrary to scientific knowledge.

Dr. Orloff's analysis of the recorded radar data revealed that, while the Baron was still outside the Final Approach Fix, Dr. Cahill did not maintain a speed of 160 knots as he was instructed, and instead sped up to just over 171 knots. Dr. Orloff testified that this increase in speed caused the separation between the Baron and the preceding Embraer to rapidly decrease, and as a result, when the Embraer was over the landing threshold for runway 36 Center, the Baron was 3.72 nautical miles behind the Embraer. Dr. Orloff further testified that, when the Baron was just 0.13 nautical miles from the landing threshold for runway 36 Right, the Baron was out of position for landing. Specifically, approximately four seconds before the Baron reached the landing threshold for runway 36 Right, it was 220 feet to the right of the center line of the approach. Dr. Orloff testified that Dr. Cahill either tried to abort the landing or keep flying for a while to reposition the Baron for landing, and that when Dr. Cahill did this, the Baron went into an aerodynamic stall, snap rolled and impacted the ground.

It was Dr. Orloff's opinion that it is not possible that the accident herein was caused by the Baron encountering the wake turbulence created by the Embraer, because the wake

turbulence created by the Embraer could not have lasted 120 seconds when it was created so close to the ground.[4] Dr. Orloff testified that the accident herein was instead caused by an aerodynamic stall of the Baron's left wing, causing the Baron to snap roll to the left and hit the ground.

Plaintiffs offered as experts Jeffrey Edwards and Michael McDermott, both of whom testified regarding the cause of the accident. Jeffrey Edwards testified as an accident reconstruction expert, and Michael McDermott testified as a radar analysis expert.

Jeffrey Edwards, who had previous experience as an aircraft accident reconstructionist in the Navy and for McDonnell Douglas, testified that the Baron was not in an aerodynamic stall immediately before the accident, and that pilot error was not a contributing cause of the accident. Mr. Edwards opined that the accident was consistent with a wake turbulence encounter caused by a loss of separation between the Baron and the Embraer. The Court notes, however, that Mr. Edwards, who was admittedly not an expert in the field of wake turbulence – including the areas of wake decay, circulation, dissipation, and strength – had done no studies or analyses on wake turbulence decay. Additionally, Mr. Edwards testified that he did not do any calculations in this case regarding the wake turbulence created by the Embraer and the effects thereof, and instead deferred to the anticipated testimony of Dr. Barnes McCormick, Plaintiffs' wake turbulence expert. However, Dr. McCormick never testified.

Mr. Edwards' conclusion that wake turbulence was a contributing cause of the accident was based on his ruling out other potential causes of the accident, such as pilot error or mechanical failure. The Court finds the testimony of the government's expert, Dr. Orloff,

---

[4]As the Court previously stated, the Baron crashed approximately 120 seconds after the Embraer crossed the landing threshold of runway 36 Center.

regarding the wake turbulence created by the Embraer, and whether the accident could have been caused by that wake turbulence more credible than that of Mr. Edwards.

Michael McDermott rendered his opinion regarding the loss of separation between the Baron and the Embraer. The Court notes that Mr. McDermott never received any formal education or training in radar analysis, and was instead qualified as an expert by virtue of his many years of experience in radar analysis. Mr. McDermott testified that at the time the Embraer crossed the landing threshold, the Baron was 3.62 nautical miles behind the Embraer. This testimony is inconsistent with Dr. Orloff's opinion, who testified that the Baron was 3.72 nautical miles behind the Embraer at the time the Embraer crossed the landing threshold. However, the evidence is clear that at the time the Embraer crossed the landing threshold, the Baron was less than four nautical miles behind the Embraer.

*Air Traffic Controllers*

The government offered Donald Hensley as an expert in air traffic control and piloting. Mr. Hensley testified that at the time of the accident, the Memphis International Airport used the ASR-9 radar system. Mr. Hensley explained that the ASR-9 radar system has certain tolerances and errors that affect the accuracy of what air traffic controllers see on their radar displays. Mr. Hensley testified that the ASR-9 radar system has a cumulative radar error of approximately 1,710 feet, which is just over a quarter-of-a-mile. This means that the actual location of an aircraft, and the location of the aircraft as it appears on the air traffic controller's radar display could differ by as much as a 1,710 feet. Mr. Hensley testified that the FAA accounts for these radar tolerances and errors in establishing separation standards.

Mr. Hensley testified that, in his opinion, the services provided to Dr. Cahill by the Memphis air traffic controllers were in accordance with the policies and procedures that were set

forth by the FAA. What the Memphis air traffic controllers saw on their radar display was limited by the rate of error of the ASR-9 system and the radar display's capabilities to show precise distance measurements. Mr. Hensley testified that, taking into consideration the tolerances and standards of error of the ASR-9 system, there was no loss of separation. Mr. Hensley based his opinion on the fact that the Memphis air traffic controllers could not see a difference in positions on their radar displays when two planes (such as the Baron and the Embraer) are 3.8 nautical miles apart versus 4 nautical miles apart, because the ASR-9 radar system was not designed to show measurements of tenths of a nautical mile. For this reason air traffic controllers measure distances by nautical miles and half-nautical miles.

Mr. Hensley testified that the Memphis air traffic controller at the ARM position (Stephen Fowler) acted reasonably and did a good job at establishing and maintaining the necessary separation between the Baron and the Embraer. He also testified that the Memphis air traffic controller at the LC2 position (Geoffrey Weiss) acted reasonably and responsively.

Plaintiffs offered Richard Burgess as an expert in air traffic control. Richard Burgess testified that all the Memphis air traffic controllers breached their duty to provide the required four nautical miles of separation between the Baron and the Embraer. Mr. Burgess further testified that their breach of duty was a cause of the accident. However, Mr. Burgess admitted that he had no expertise in the area of wake turbulence, and stated that he did not expressly consider the tolerances and standards of errors for the ASR-9 radar system in his analysis because he is not an expert on radar data.

*Eye Witnesses & First Responder*

Lieutenant Travis Hollar was an eye witness to the accident, and observed the Baron on its final approach to runway 36 Right. Lt. Hollar, a pilot, was in the rear seat of an F18 that was

taxiing southbound between runway 36 Center and 36 Right at the time of the accident. Lt. Hollar saw the Baron over runway 36 Right, approximately ten to fifteen feet above the ground, when the Baron simultaneously and slowly yawed left and rolled left. As the Baron yawed and rolled to the left, Lt. Hollar saw the Baron pitch up about fifteen degrees,[5] snap roll 180 degrees to the left, and pancake onto the ground on its back. Lt. Hollar stated that when the Baron pitched up, it was a more pronounced pitch-up than would be expected when landing, and it looked like Dr. Cahill was attempting a "wave-off," or a "go-around."[6]

Octavian Fizer was also an eye witness to the accident, and is employed by Airfield Maintenance at the Memphis International Airport. Mr. Fizer was spraying the grass on the airfield at the time of the accident. Mr. Fizer saw the Baron coming in straight over the centerline of runway 36 Right with its landing gear down, and then saw the Baron pitch up slightly, and then abruptly flip over to the left.

Charles Phillip Lomel, Jr. was a passenger in the Baron at the time of the accident. Mr. Lomel testified that his last memory of the flight was looking out of the front windshield right before landing and seeing the runway as if they were right over it. Immediately after this, Mr. Lomel bent down to tie his shoes, and when he looked up, saw Dr. Cahill reach for the throttle and say "oh shit." He does not recall that Dr. Cahill said anything else, and does not recall the Baron hitting the ground.

T.L. Williams was a firefighter who responded to the scene of the accident on the date of the crash. Mr. Williams treated passenger Charles Lomel, whom he found on the ground about

---

[5]Lt. Hollar estimated the degree to which the Baron pitched up, stating that he was purely guessing.

[6]A "wave-off" or a "go-around" is when a pilot decides to pull up the aircraft and go around for another landing.

thirty feet from the tail of the crashed Baron. While Mr. Williams was treating Mr. Lomel, Mr. Lomel told him that during the landing, Dr. Cahill said something to the effect of, "we're out of position for landing, and we're going to abort."

The Court credits the testimony of Mr. Williams regarding Mr. Lomel's statement. Mr. Lomel made the statement immediately after the accident, when the events leading up to the accident were fresh in his memory. Moreover, at the time he made the statement, Mr. Lomel had no reason to believe that recounting the events leading up to the accident would be against his interest. Finally, Mr. Williams was a first responder who would have no reason to fabricate Mr. Lomel's statement, as he had no interest in the outcome of this case.

*Weather Conditions*

The government's expert witness, Lee Ray Hoxit, a meteorologist, presented credible evidence of the weather conditions at the time of the accident. The weather conditions in Memphis at 10:00 on July 3, 2002 were good. The winds were light to calm, out of the north/northwest at three to five miles per hour, and there was at least ten miles visibility. There were scattered clouds in the sky at 3,000 feet above ground level ("AGL") and broken layers of clouds at 3,800 feet AGL. The temperature was seventy-six to eighty degrees. The air near the ground was unstable due to a super-adiabatic lapse rate, which means that there was a relatively high level of natural atmospheric mixing in the lowest several hundred feet of the atmosphere. Dr. Hoxit opined that the super-adiabatic lapse rate – or, the atmospheric conditions near the ground at the time of the accident, would cause a wake vortex to decay rapidly.

*Wake Turbulence Encounter*

The government offered George Clark Greene as an expert on wake turbulence, including wake vortex decay. Mr. Greene worked for both the National Aeronautics and Space

Administration (NASA) and the FAA, specializing in wake turbulence research, for over twenty-five years. He developed one of the first theories for the way wakes decay in the atmosphere, and was the Chief Scientific and Technical Advisor for Wake Turbulence for the FAA. The Court readily credits the testimony of Mr. Greene regarding wake turbulence.

Mr. Greene opined that wake turbulence did not cause or contribute to the accident in this case. His opinion was based, in part, on the fact that the Embraer's wake would have been generated very close to the ground, and therefore would have decayed very rapidly. Mr. Greene explained that wake vortices are rotating flows that have very high velocities, and that when they are generated near the ground, there is a lot of scrubbing of the air against the ground which generates secondary rotation in the opposite direction of the original rotation. The opposite rotations create a lot of frictional effects which reduce the strength of the vortex very quickly. Mr. Greene further testified that, because the lifetimes of wake vortices which are created near the ground are so short, the wake vortex created by the Embraer during its landing could not have lasted 120 seconds in order to affect the flight path of the Baron during its landing. Mr. Greene opined that it was scientifically impossible for the wake vortex that was created by the Embraer on runway 36 Center, under the conditions surrounding this accident, to have lasted two minutes and still be alive on runway 36 Right at the time the Baron landed.

The government also offered Shahar Ladecky as an expert in computer simulation and modeling, with a specialty in the use of wake turbulence models. Mr. Ladecky has worked extensively with the FAA for the Aviation Flight Standards department, and helped develop the Air Space Simulation Analysis for TERPS[7] ("ASAT") that the FAA uses in performing safety evaluations, including safety evaluations for wake turbulence. The ASAT program incorporates

---

[7] "TERPS" is an acronym used by the FAA, meaning Terminal Instrument Procedures.

NASA's wake turbulence decay model, which is the most widely accepted wake turbulence decay model for predicting wake decay, and is the model the FAA currently uses to perform safety related studies regarding wake turbulence.[8] The ASAT includes modeling and simulation features and is capable of analyzing the probability of a wake encounter.

Mr. Ladecky used the ASAT program to determine whether the wake turbulence created by the Embraer could have lasted long enough to affect the Baron's flight path. In his analysis, Mr. Ladecky took into consideration the weight and wingspan of the Embraer, the speed at which the Embraer was flying on its final approach, the Embraer's proximity to the ground, and the atmospheric conditions that existed at the time of the accident.[9] Mr. Ladecky opined that the results of his analysis clearly demonstrated that the wake turbulence generated by the Embraer completely dissipated more than one minute before the Baron crossed the landing threshold of runway 36 Right. He further opined that even in the most ideal conditions permitting wake turbulence to persist for the longest possible amount of time, the wake turbulence generated by the Embraer would have completely dissipated before the Baron crossed the landing threshold of runway 36 Right.

The Court finds the testimonies and opinions of both George Green and Shahar Ladecky both credible and persuasive, based on their training and extensive work experience. The Court further finds that any wake turbulence created by the Embraer would have completely dissipated by the time the Baron landed on runway 36 Right, and could not and did not affect the Baron's

---

[8]NASA's wake turbulence decay model is called the AVOSS (Aircraft Vortex Spacing System) Predictor Algorithm ("APA").

[9]Mr. Ladecky clarified that in determining which atmospheric conditions to input into the ASAT program, he used Dr. Orloff's report, and used the atmospheric conditions that would cause the wake turbulence created by the Embraer to last the longest and drift the most.

flight path.

Although the Plaintiffs listed Dr. Barnes McCormick as their expert in the area of wake turbulence, they failed to call him as a witness during this trial. The only expert testimony Plaintiffs presented on the issue of a wake turbulence encounter was the testimony of Jeffrey Edwards, who testified that, because he had ruled out other possible causes of the accident, the cause of the accident must have been a wake turbulence encounter. As the Court previously noted however, Mr. Edwards was admittedly not an expert in the field of wake turbulence, and had done no analyses on wake turbulence decay generally or as it related to this accident. Mr. Edwards deferred to the anticipated testimony of Dr. Barnes McCormick on the issue of the wake turbulence created by the Embraer and the effects thereof on the Baron, but Dr. McCormick never testified.

## III. Conclusions of Law

*Summary of the Law*

This Court has jurisdiction over this action pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C.§ 1346(b) and 28 U.S.C. §§ 2671 *et seq*. Under the FTCA, the United States may be held liable for damages caused by the negligence or wrongful act or omission of an employee of the government acting within the scope of his employment under circumstances where the United States, if a private person, would be responsible to the claimant in accordance with the law of the place where the act or omission occurred. 28 U.S.C. § 1346(b). Under the FTCA, the law of the jurisdiction where the alleged act or omission occurred governs the rights and the liabilities of the parties. See Richards v. United States, 369 U.S. 1, 11 (1962). Because the accident in the instant case occurred in Memphis, Tennessee, the parties herein agree that the law of Tennessee shall apply to the liability and negligence issues of this case.

To establish a claim for negligence under Tennessee law, Plaintiffs must show: "'(1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the standard of care amounting to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate or legal cause.'" Draper v. Westerfield, 181 S.W. 3d 283, 290 (Tenn. 2005)(quoting Biscan v. Brown, 160 S.W. 3d 462, 478 (Tenn. 2005)). Tennessee courts have defined duty of care "to be the legal obligation owed by defendant to plaintiff to conform to a reasonable person standard of care for protection against unreasonable risks of harm." See McClung v. Delta Square Ltd. P'Ship, 937 S.W. 2d 891, 895 (Tenn. 1996)(citing McCall v. Wilder, 913 S.W. 2d 150, 153 (Tenn. 1995)). Assuming a duty is owed to a plaintiff, it must then be determined whether a defendant has exercised reasonable care under the circumstances. Id. (citations omitted). If a defendant has not, the duty has been breached. Id. In this regard, Tennessee courts have observed that the "term reasonable care must be given meaning in relation to the circumstances. Ordinary, or reasonable, care is to be estimated by the risk entailed through probable dangers attending the particular situation and is to be commensurate with the risk of injury." Doe v. Linder Const. Co., Inc., 845 S.W. 2d 173, 178 (Tenn. 1992).

Part of a plaintiff's burden in a negligence action is proving that the injury or loss suffered was caused by the defendant's breach of his duty. The breach must be both the cause in fact and a proximate cause of the plaintiff's injury or loss. Cause in fact and proximate cause are very different concepts. Snyder v. LTG Lufttechnische GmbH, 955 S.W. 2d 252, 256 n. 6 (Tenn. 1996)(citations omitted). "Cause in fact refers to the cause and effect relationship between the defendant's tortious conduct and the plaintiff's injury or loss. Thus, cause in fact deals with the "but for" consequences of an act." Id. (citing Kilpatrick v. Bryant, 868 S.W. 2d 594, 598 (Tenn. 1993)). The defendant's conduct is deemed to be the cause in fact of the

plaintiff's injury or loss if such injury or loss would not have occurred but for the defendant's conduct. Id. Proximate cause, or legal cause, "concerns a determination of whether legal liability should be imposed where cause in fact has been established." Id. Tennessee law has established a three-pronged test for proximate causation:

> (1) the tortfeasor's conduct must have been a "substantial factor" in bringing about the harm being complained of; and (2) there is no rule or policy that should relieve the wrongdoer from liability because of the manner in which the negligence has resulted in the harm; and (3) the harm giving rise to the action could have reasonably been foreseen or anticipated by a person of ordinary intelligence and prudence.

McClenahan v. Cooley, 806 S.W. 2d 767, 775 (Tenn. 1991)(citations omitted).

*The Law Applied to the Facts of this Case*

A. Duty

There is no dispute that the air traffic controllers working at the Memphis International Airport on July 2, 2003 had a duty to promote safety in air transportation. The Court further finds that the Memphis air traffic controllers had a duty to maintain the minimum separation standard between the Baron and the Embraer aircraft. Section 5-5-4(f) of FAA Order 7110.65N provides that the Memphis air traffic controllers were required to separate the Baron from the Embraer by four nautical miles, measured at the time the Embraer was over the landing threshold.

B. Breach

The evidence produced at trial was that there was less than the required four nautical miles between the Baron and the Embraer at the time the Embraer crossed the landing threshold. As the Court previously noted, the evidence conflicted as to the specific distance between the Embraer and the Baron when the Embraer was over the landing threshold, but was consistent in that it was less than four nautical miles. As such, the Court finds it unnecessary to determine the

exact distance between the Baron and the Embraer at the time the Embraer crossed the landing threshold.

The Court finds Plaintiffs' expert evidence on the issue of whether the loss of separation between the Baron and the Embraer was caused by a breach of duty on the part of the Memphis air traffic controllers persuasive. Plaintiffs' witness, Jeffrey Burgess, testified that there was a breach of duty. His opinion was that the Memphis air traffic controllers failed to act reasonably because they failed to provide the four nautical miles of minimum separation between the Baron and the Embraer.

It is not exactly clear to this Court what the Memphis air traffic controllers' radar displays showed on the date of the accident, and the testimony of the air traffic controllers on duty was not helpful in this regard.[10] It is clear, however, that at the time the Embraer crossed the landing threshold of runway 36 Center, the Baron was less than four nautical miles behind it. Accordingly, the Court finds that Plaintiffs have shown, by a greater weight of the evidence, that the Memphis air traffic controllers breached their duty to maintain a separation of four nautical miles between the Baron and the Embraer, measured at the time the Embraer was over the landing threshold.

C. Injury or Loss

There is no dispute that Plaintiffs suffered an injury or loss as a result of this accident. Plaintiff Dr. Cahill and his front seat passenger, Plaintiff John Murphy, were killed in the crash; the two rear-seat passengers, Plaintiff Charles Phillip Lomel, Jr. and Plaintiff Edward Brown,

---

[10]Each of the air traffic controllers who testified in this action stated that they did not remember to what magnification they had their radar displays set at the time of the accident. Each of them also testified that they did not believe a loss of separation had occurred between the Baron and the Embraer.

sustained serious injuries.

D. Causation

The crux of Plaintiffs' case throughout the trial was that the Memphis air traffic controllers failed to separate the Baron and the preceding Embraer by the required four nautical miles, and that this failure unnecessarily exposed the Baron to the wake turbulence created by the Embraer, causing the Baron to abruptly roll left and crash on its roof. To prove cause in fact, Plaintiffs had the burden of proving that but for the Memphis air traffic controller's failing to maintain the required separation, the Baron would not have encountered the wake turbulence created by the Embraer and subsequently crashed. See Snyder v. LTG Lufttechnische GmbH, 955 S.W. 2d 252, 256 n. 6 (Tenn. 1996). To prove proximate cause, Plaintiffs had the burden of proving, among other things, that the Memphis air traffic controllers' conduct was a "substantial factor" in bringing about a wake turbulence encounter and resulting crash. McClenahan v. Cooley, 806 S.W. 2d 767, 775 (Tenn. 1991)(citations omitted). The Court finds that Plaintiffs have not met their burden. Plaintiffs have not shown, by a greater weight of the evidence, that on July 2, 2003, any breach of duty in failing to maintain separation by the Memphis air traffic controllers was either the "but for" cause of the accident or a "substantial factor" in causing the accident.

The overwhelming weight of the evidence showed that the Baron did not encounter the wake turbulence created by the Embraer. The Court credits the expert testimonies of Dr. Kenneth Orloff, Dr. Ray Hoxit, George Clark Greene, and Shahar Ladecky — all of whom found that the wake turbulence created by the Embraer would not, and in fact could not, have lasted 120 seconds in order to affect the flight path of the Baron. These expert testimonies were also consistent with the eye witness testimony of Lieutenant Hollar and first responder testimony of

T.L. Williams, which suggested that the cause of this accident was not a wake turbulence encounter, but rather a botched attempt to pull up the aircraft and go around for another landing. The only evidence presented during the trial suggesting that the cause of the accident was a wake turbulence encounter was that of Jeffrey Edwards. The Court finds his testimony neither credible nor persuasive on the issue of a wake turbulence encounter, as he was admittedly not an expert on in the area of wake turbulence and had done no analysis regarding wake turbulence decay.

Absent any credible or persuasive evidence that this accident was caused by a wake turbulence encounter, and in the face of such overwhelming evidence that the accident was not caused by a wake turbulence encounter, the Court finds that there can be no causal link between the actions of the Memphis air traffic controllers in failing to maintain separation and the accident itself.

E. Pilot Error

The government alleges that the cause of this accident was pilot error. The government offered the testimony of Lieutenant Hollar, an eyewitness who testified that when the Baron was landing, it looked like Dr. Cahill was attempting to pull up the aircraft and go around for another landing. The government also offered the testimony of T.L. Williams, a first responder who testified that while he was treating Mr. Lomel at the scene of the accident, Mr. Lomel told him that during the landing, Dr. Cahill said something to the effect of, “we’re out of position for landing, and we’re going to abort.” The government offered Dr. Kenneth Orloff as an expert on accident reconstruction, who opined that Dr. Cahill caused the accident when he tried to either reposition the Baron for landing or abort the landing altogether, causing the Baron to go into an aerodynamic stall, snap roll, and impact the ground.

The Court finds that the government's evidence did not prove, by the greater weight of the evidence, that the accident herein was caused by pilot error. The Court finds the expert testimony of Dr. Orloff in this regard was speculative, and that the testimonies of Lt. Hollar and T.L. Williams do not lead this Court to find that is was more probable than not that this accident was caused by pilot error.

## IV. Conclusion

The Court finds that the Memphis air traffic controllers breached their duty by failing to maintain the required separation between the Baron and the Embraer. However, this Court further finds that the cause of this accident was not a wake turbulence encounter. Therefore, the Court finds that the Memphis air traffic controllers' failure to maintain the required separation between the Baron and the Embraer did not cause the accident, nor was it a substantial factor in causing the accident.

Accordingly, the Court finds in favor of the defendant, the United States of America. The Clerk is directed to enter judgment in favor of the government and to close this case.

**DONE AND ORDERED** at Tampa, Florida, this 10th day of April, 2008.

Susan C. Bucklew

SUSAN C. BUCKLEW
United States District Judge

Copies to:
Counsel of Record